NO. 4-10-0510      Opn Filed 3/18/11

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: LINDA K., a Person Found | ) | Appeal from |
| Subject to Administration of | ) | Circuit Court of |
| Psychotropic Medication, | ) | Sangamon County |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | No. 10MH503 |
|     Petitioner-Appellee, | ) | |
|     v. | ) | Honorable |
| LINDA K., | ) | Robert T. Hall, |
|     Respondent-Appellant. | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.

Justice Appleton concurred in the judgment and opinion.

Justice Myerscough[1] dissented, with opinion.

**OPINION**

Following a July 2010 hearing, the trial court found respondent, Linda K., subject to involuntary administration of psychotropic medication (405 ILCS 5/2-107.1 (West 2008)).

Respondent appeals, arguing that the trial court's judgment should be reversed because the State failed to present evidence that respondent was provided with the statutorily mandated written information about the side effects, risks, benefits, and alternatives of the proposed involuntary administration of psychotropic medication. We agree and reverse.

I. BACKGROUND

In June 2010, Sriehri Patibandla, respondent's

_____

[1]Justice Myerscough registered her dissent with this opinion before she resigned from the Appellate Court of Illinois, Fourth District, in order to be sworn in as a judge of the United States District Court, Central District of Illinois.

psychiatrist at McFarland Mental Health Center, filed a petition, seeking to involuntarily administer psychotropic medication to respondent. The petition alleged that respondent (1) suffered from a mental illness--namely, schizophrenia, paranoid type, and (2) was "noncompliant with medication in the initial days of hospitalization and also in the community."

At the July 2010 hearing on the petition, Patibandla testified that respondent had been diagnosed with schizophrenia. Respondent was initially committed to McFarland because she had previously been found unfit to stand trial. According to Patibandla, respondent believed that she had been granted immunity by the President of the United States, and respondent had a "very poor comprehension of her legal situation." Patibandla explained that respondent (1) refused to take psychotropic medication, (2) lacked insight about her mental illness, (3) failed to acknowledge her mental illness, and (4) had suffered from her mental illness for at least 20 years.

Patibandla opined that because respondent showed mild improvement with court-ordered medication, he requested that the trial court allow him to involuntarily administer the following psychotrophic medications: (1) Abilify (10 to 30 milligrams per day), (2) Abilify injection (9.75 milligrams per day), and (3) Ativan (2 to 8 milligrams per day). Patibandla further requested that the court authorize the involuntary administration of the following alternative psychotrophic medications if respondent did not show improvement: (1) Risperdal (1 to 10 milligrams per

day), (2) Risperdal Consta (25 to 50 milligrams every two weeks), (3) Haldol (5 to 30 milligrams per day), (4) Haldol Decanoate (25 to 100 milligrams one time per month), (5) Seroquel (100 to 800 milligrams per day), and (6) Clozaril (25 to 800 milligrams per day).

Additionally, Patibandla requested the following testing and procedures necessary for the safe and effective administration of the psychotrophic medications: (1) complete blood count; (2) complete metabolic panel; (3) lipid panels; (4) an electrocardiogram; (5) tardive dyskinesia monitoring; (6) physical- and mental-health assessments; and (7) pulse and blood-pressure assessments. Patibandla acknowledged that the suggested psychotropic medications had possible side effects, including weight gain, metabolic syndromes, tardive dyskinesia, white-cell suppression, and oversedation. Patibandla added that respondent was currently taking Abilify and Ativan and had not experienced any adverse side effects.

Patibandla explained that he had discussed the benefits and side effects of the proposed treatment with respondent. Thereafter, the following exchange occurred between the prosecutor and Patibandla:

"Q. [STATE:] Has [respondent] been handed a written list of the side effects?

A. [PATIBANDLA:] Yes, she was.

Q. [STATE:] Did she take them in her hand?

A. [PATIBANDLA:] Yes, she did."

- 3 -

Patibandla further explained that (1) treatment without medication was inappropriate for respondent because of her mental illness, and (2) group or individual therapy without medication would be an inadequate treatment alternative.

Patibandla based his opinion that respondent had been mentally ill for at least 20 years on information gained from respondent's sister.  Patibandla also acknowledged that respondent claimed that (1) she was allergic to all of the recommended medications and (2) the psychotropic medication caused her to experience tremors.

Respondent testified that she discussed the medications that Patibandla was seeking to involuntarily administer with him, and she informed him that she was allergic to "medications that are mind altering."  Respondent added that she was not asked whether she had received any written notification regarding the side effects, risks, benefits, and alternatives of the proposed treatment.  Respondent further testified that it was illegal to administer the proposed medications because they had previously been "pulled off the shelf."  Respondent then (1) requested "immunity" because she believed her case had been dismissed five times, (2) claimed "double jeopardy" because she was being tried more than once for the same crime, and (3) expressed concern regarding her constitutional rights.  Because respondent believed that she was going to be sentenced by the trial court, she requested "probation, misdemeanor, time[-]served court supervision for employment reasons for a suspension first time offense."

Based on this evidence, the trial court found respondent subject to involuntary administration of the psychotropic medications for a period not to exceed 90 days as requested by Patibandla.

This appeal followed.

## II. ANALYSIS

### A. The Mootness Doctrine and This Case

Initially, we note that the trial court entered the involuntary-treatment order on July 2, 2010, and limited the enforceability of the order for a period not to exceed 90 days. The 90-day period has passed. As a result, this case is moot. Therefore, before we can address the merits of respondent's appeal, we must first determine whether any exception to the mootness doctrine applies.

An issue raised in an otherwise moot appeal may be reviewed when (1) addressing the issues involved is in the public interest, (2) the case is capable of repetition, yet evades review, or (3) the petitioner will potentially suffer collateral consequences as a result of the trial court's judgment. *In re Alfred H.H.*, 233 Ill. 2d 345, 355-61, 910 N.E.2d 74, 80-83 (2009).

The collateral-consequences exception to the mootness doctrine allows a reviewing court to consider an otherwise moot case because a respondent has suffered, or is threatened with, an actual injury traceable to the petitioner and will likely be redressed by a favorable judicial decision. *Alfred H.H.*, 233

Ill. 2d at 361, 910 N.E.2d at 83.  "The collateral-consequences exception applies to a first involuntary-treatment order."  *In re Joseph P.*, Nos. 4-10-0346, 4-10-0347, cons., slip op. at 8 (Ill. App. Dec. 22, 2010).  The collateral-consequences exception applies where (1) the record does not indicate that the respondent has previously been subject to an involuntary-treatment order and (2) it appears that the respondent will likely be subject to future proceedings that would be adversely impacted by her involuntary treatment.  *In re Wendy T.*, No. 2-09-0595, slip op. at 5 (Ill. App. Dec. 8, 2010), 940 N.E.2d 237, 241-42.

In this case, our review of respondent's particular medical history does not indicate that she has ever properly been subjected to an order for involuntary administration of medication.  Further, respondent's condition indicates that she would very likely be subject to future proceedings that would be adversely impacted by past involuntary treatment.  Thus, we conclude that the collateral-consequences exception applies.

### B. Respondent's Claim That the State Failed To Prove That She Was Provided with Certain Statutorily Mandated Information in Writing

Respondent argues that the State failed to prove by clear and convincing evidence that she lacked capacity to make a reasoned decision about the proposed treatment because she was not provided the statutorily mandated written information about the side effects, risks, benefits, and alternatives of the proposed treatment.  We agree.

Generally, we review a trial court's order permitting

- 6 -

the involuntary administration of psychotropic medication under the manifest-weight-of-the-evidence standard. *In re Louis S.*, 361 Ill. App. 3d 774, 779, 838 N.E.2d 226, 231 (2005). Under this standard, we will reverse a court's judgment only when the opposite conclusion is apparent or the court's findings are unreasonable, arbitrary, or not based on the evidence. *Louis S.*, 361 Ill. App. 3d at 779, 838 N.E.2d at 231.

Pursuant to section 2-107.1 of the Mental Health and Developmental Disabilities Code (Mental Health Code), psychotropic medication may be administered when the trial court has determined by clear and convincing evidence that each of the following factors are present:

"(A) That the recipient has a serious mental illness or developmental disability.

(B) That because of said mental illness or developmental disability, the recipient currently exhibits any one of the following: (i) deterioration of his or her ability to function, as compared to the recipient's ability to function prior to the current onset of symptoms of the mental illness or disability for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior.

(C) That the illness or disability has existed for a period marked by the continuing

- 7 -

presence of the symptoms set forth in item
(B) of this subdivision (4) or the repeated
episodic occurrence of these symptoms.

    (D) That the benefits of the treatment
outweigh the harm.

    (E) That the recipient lacks the capac-
ity to make a reasoned decision about the
treatment.

    (F) That other less[-]restrictive ser-
vices have been explored and found inappro-
priate.

    (G) If the petition seeks authorization
for testing and other procedures, that such
testing and procedures are essential for the
safe and effective administration of the
treatment."  405 ILCS 5/2-107.1(a-5)(4)(A)
through (a-5)(4)(G) (West 2008).

However, the Mental Health Code goes further, imposing
additional requirements.  Section 2-102(a-5) of the Mental Health
Code also provides as follows:

    "If the services include the administration
of *** psychotropic medication, the physician
or the physician's designee shall advise the
recipient, *in writing*, of [(1)] the side
effects, [(2)] risks, and [(3)] benefits of
the treatment, as well as [(4)] alternatives

- 8 -

to the proposed treatment, to the extent such advice is consistent with the recipient's ability to understand the information communicated." (Emphasis added.) 405 ILCS 5/2-102(a-5) (West 2008).

In *In re Dorothy J.N.*, 373 Ill. App. 3d 332, 336, 869 N.E.2d 413, 416 (2007), this court explained that strict compliance with *all* of section 2-102(a-5) is necessary to protect the liberty interests of the mental-health treatment recipient. In *Dorothy J.N.*, we held that verbally advising the recipient of the side effects of the proposed medication was insufficient to satisfy section 2-102(a-5). *Dorothy J.N.*, 373 Ill. App. 3d at 336, 869 N.E.2d at 416. The Second District Appellate Court recently agreed, concluding that a failure to provide a patient with written notification of alternatives to proposed treatment pursuant to the Mental Health Code compelled reversal. *In re Nicholas L.*, No. 2-09-1181, slip op. at 15 (Ill. App. Feb. 16, 2011).

Here, the State points to Patibandla's petition for involuntary administration of psychotropic medication to argue that respondent was provided with written notification that other, less-restrictive treatment alternatives were inappropriate. The petition states "[o]ther less[-]restrictive treatment services, such as counseling, therapy, education, activities and rehabilitation, have been explored," and these treatment alternatives were found inappropriate for respondent without the use of

- 9 -

psychotropic medications. Although the petition stated that other, less-restrictive treatment alternatives were considered, this "notice" is not sufficient to comply with the Mental Health Code because, as we previously explained, the State must present evidence that respondent received *written* notification of the alternatives (*Louis S.*, 361 Ill. App. 3d at 780-81, 838 N.E.2d at 232-33).

Additionally, the State suggests that Patibandla's testimony regarding his recommendations of alternative medications was sufficient to comply with the requirements of the Mental Health Code. Because, as we explained in *Dorothy J.N.*, strict compliance with *all* of the Mental Health Code is required, including the section 2-102(a-5) mandate that the list of alternatives be in writing, we disagree.

Further, the State's claim that its questioning of Patibandla regarding respondent being handed a written list of the side effects was sufficient for the trial court to conclude the State proved that respondent received written information on the side effects of the proposed treatment. However, the record before us shows that the State failed to present any evidence to prove respondent was provided with the statutorily mandated written information on the risks, benefits, and alternatives of the proposed treatment.

In closing, we note that the prosecutors could assist the attending physicians by preparing, in advance, a written-description form regarding the involuntarily administered medi-

cine that would comply with section 2-102(a-5) of the Mental Health Code. Then, to comply with the statute, all that the physician need do would be to hand that description to the patient. For more detail on this procedure, see *Dorothy J.N.*, 373 Ill. App. 3d at 338-39, 869 N.E.2d at 418 (Steigmann, P.J., specially concurring) (outlining the procedure for complying with section 2-102(a-5) of the Mental Health Code). Additionally, to prove the State's case by clear and convincing evidence, the prosecutor must ask questions to fulfill the statutory requirements that respondent was advised *in writing* on the four mandated matters: side effects, risks, benefits, and alternatives to the proposed treatment.

Because the State failed to prove, by clear and convincing evidence, that respondent was provided with the statutorily mandated written information--that is, the risks, benefits, and alternatives of the proposed treatment--we conclude that the trial court's judgment must be reversed. See *Dorothy J.N.*, 373 Ill. App. 3d at 336, 869 N.E.2d at 416 ("'the right to written notification is not subject to a harmless-error analysis' and *** strict compliance with the procedural safeguards of the Mental Health Code is necessary to protect the liberty interests involved" (quoting *Louis S.*, 361 Ill. App. 3d at 780, 838 N.E.2d at 232)).

### III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment.

- 11 -

Reversed.

JUSTICE MYERSCOUGH, dissenting:

I once again respectfully dissent.  As in *Dorothy J.N.,* I would affirm because the trial court did not abuse its discretion in authorizing administration of involuntary treatment.  The common-law record includes the signed petition for administration of authorized involuntary treatment and a treatment plan that states respondent had been delivered a written notice of the risks and benefits of the proposed treatment.  That petition includes the following language of affirmation:

> "I have read and understood this [p]etition and affirm that the statements made by me are true to the best of my knowledge.  I affirm that I advised the individual, in writing, of the risks and benefits of the proposed treatment."

Dr. Patibandla, the treating psychiatrist who testified at the petition-for-administration-of-involuntary-treatment hearing, signed that petition..

That notice alone is sufficient compliance with section 102(a-5) (405 ILCS 5/2-102(a-5) (West 2008)).  See *In re Jill R.,* 336 Ill. App. 3d 956, 964, 785 N.E.2d 46, 52 (2003) (petition and treatment plan indicated written notice given was sufficient compliance).

The majority disregards the written-notice affirmation, the oral notice testified to, as well as the contents of the petition, which again reiterate:

- 13 -

"13. I have explained the risk and the intended benefits of the treatment to the patient/respondent and also have provided that information in written or printed form to the patient/respondent.

YES

14. The patient/respondent objects to the administration of the requested psychotropic medication(s) and/or the range of dosages.  However, the patient/respondent lack[s] the capacity to make a reasoned decision about the treatment for the following reasons:

She relates that she does not have a mental illness and does not need medication. She claims 'I don't want to be hooked onto a medication.'

15. Other less restrictive treatment services, such as counseling, therapy, education, activities, and rehabilitation, have been explored.

YES

However, such treatment services have been found to be inappropriate to treat the patient/respondent without use of psychotropic medication for the following

- 14 -

reasons:

> She is unable to participate in any non-
> pharmacological treatments that are available
> due to her disorganized thought processes."

Further, the majority ignores the language in the Mental Health Code that requires written notice only "to the extent such advice is consistent with the recipient's ability to understand the information communicated" (405 ILCS 5/2-102(a-5) (West 2004)). Respondent clearly exhibited an inability to understand the information communicated.

Concededly, the supreme court reversed this court on the written-notice requirement in *In re Steven P.*, 207 Ill. 2d 604, 801 N.E.2d 947 (2004) (nonprecedential supervisory order), in a terse supervisory order. However, this appellate court had based its decision on the respondent's forfeiture of the written-notice requirement. The record was silent on any written or oral attempts to notify the respondent of the medication's side effects. Moreover, the supervisory order specifically exercised its supervisory authority "in light of the People's factual and legal concessions," to which this court is not privy. *Steven P.*, 207 Ill. 2d at 604, 801 N.E.2d at 947. Moreover, supervisory orders are not precedential. "As the State pointed out, supervisory orders are unpublished, recite no facts, and provide no rationale upon which the principles of *stare decisis* may attach." *People v. Jackson*, 154 Ill. App. 3d 320, 324, 507 N.E.2d 89, 91 (1987).

- 15 -

Our record is not so silent.  Not only was the written notice pleaded and affirmed in the petition, but Dr. Patibandla also testified he had verbally notified respondent of the potential side effects:

"Q.  Have you had occasion to discuss with Miss [K.] the benefits and side effects of the treatment that you're seeking in this Petition?

A.  Yes, I have.

Q.  What does she say?

A.  She did not believe that she would need medication and said, 'I don't want to be hooked onto medicine.'

Q.  Has she been handed a written list of the side effects?

A.  Yes, she was.

Q.  Did she take them in her hand?

A.  Yes, she did.

Q.  Did she have any questions for you, Doctor, about the side effects?

A.  She did not."

The doctor was very specific about the side effects:

"Patients may gain weight, there is metabolic syndromes to be concerned about, and there is tardive dyskinesia with Haldol medication and white cell suppression with

- 16 -

Clozapine."

Further, the majority's strict compliance with written notice is not mandated by the statute or in *Steven P.* where, as here, the respondent exhibited an inability to understand the written information.  She clearly lacked the capacity to give informed consent.  Dr. Patibandla testified:

> "She has a lot of fixed false beliefs, which are delusional thoughts she possesses. She's charged with two counts of forgery from Madison County, and she was sent to us as unfit to stand trial because of this fixed and false beliefs.  She believes that she went through some sort of appeal process."

In addition, the following exchange occurred:

> "Q. Does she have the capacity to give informed consent?
>
> A. She does not.
>
> Q. Does she acknowledge having a mental illness?
>
> A. She does not.
>
> Q. Does she have any understanding of her mental illness?
>
> A. She does not.
>
> Q. Does she have any insight at all into her illness?
>
> A. She does not."

For these reasons, I would affirm the trial court.